**J. L. BARTON, Plaintiff,**

v.

**BECHTEL CORPORATION, Pacific Bech-
tel Corporation, Second Doe and
Third Doe, Defendants.**

Civ. A. No. 40481.

United States District Court
N. D. California, S. D.

Nov. 1, 1965.

Norman Leonard, Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for plaintiff.

David Van Hoesen, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendant, Pacific Bechtel Corp.

ROGER T. FOLEY, Senior District Judge.

On February 1, 1962, Pacific Bechtel Corporation filed its Petition for Removal of the above entitled action from the Superior Court of the State of California for the City and County of San Francisco to the above entitled court. Among other things the Petition for Removal recites:

"1. Petitioner [Pacific Bechtel Corporation] is the defendant in the civil action commenced on or about November 22, 1961 in the Superior Court of the State of California for the City and County of San Francisco, No. 516637, entitled 'J. L. Barton, Plaintiff, v. Bechtel Corporation, a corporation, First Doe, Second Doe and Third Doe, Defendants';

"2. Service of summons and complaint was originally made upon defendant, Bechtel Corporation, a Delaware corporation, with its principal place of business in San Francisco, California. Subsequent thereto, and on January 9, 1962, said Bechtel Corporation filed a Notice of Motion for Summary Judgment for Defendant Bechtel Corporation in that action. On or about January 11, 1962, plaintiff filed a Designation of Party Sued As First Doe, naming Pacific Bechtel Corporation as first doe in said action. On or about January 29, 1962 there was filed an Attorneys' Notice of Appearance on behalf of Pacific Bechtel Corporation in said action. On or about January 31, 1962 there was filed a Dismissal of defendant Bechtel Corporation in said action. The present parties to said action are: J. L. Barton, plaintiff, and Pacific Bechtel Corporation, defendant;

"3. * * *;

"4. Said action is a civil action, of which this court has original jurisdiction under Title 28, U.S.C., Section 1332, and is one which defendant is entitled to remove to this court pursuant to Title 28, U.S.C., Section 1441, in that the matter in controversy exceeds the sum of $3,-000.00 [sic], exclusive of interest and costs, the action is between citizens of a State and a foreign state and at the time of the commencement of this action the defendant, Pacific Bechtel Corporation, has been and still is a corporation duly incorporated and existing under and by virtue of the laws of the Republic of Panama, and plaintiff has been and still is a citizen of the State of California. The said defendant was not at the time of the institution of this action, nor now is, a citizen of the State of California.

"5. * * *

"WHEREFORE, defendant [Pacific Bechtel Corporation] prays that the above action now pending against it in the Superior Court of the State of California for the City and County of San Francisco, * * *, hereby be removed from said state court to this court."

It will be noted that in Paragraph 4 above, Petitioner Pacific Bechtel Corporation alleges that it is entitled to remove to this Court pursuant to Title 28 U.S.C. § 1441 in that the matter in controversy exceeds the sum of $3,000. Section 1332 of Title 28 U.S.C., at the time of filing of the action in the Superior Court of San Francisco, No. 516637, and prior to the time of filing the Petition for Removal provided:

"§ 1332. Diversity of citizenship; amount in controversy; costs

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of

$10,000, exclusive of interest and costs, and is between—

"(1) * * *;

"(2) citizens of a State, and foreign states or citizens or subjects thereof; * * *."

From the Exhibit A referred to and attached to and made a part of the Petition for Removal, it appears that the statement in said Petition that the matter in controversy exceeds the sum of $3,000 was inadvertently made instead of alleging that the matter in controversy exceeded the sum of $10,000. The Court will consider the Petition as if $10,000 had been stated therein instead of $3,000. Said Exhibit A is a correct copy of plaintiff's complaint filed in the Superior Court of the State of California.

Among the allegations contained in the complaint filed in the Superior Court are the following:

"VI That by reason of the premises, plaintiff has been damaged in the sum of $11,900.00, being wages he would have earned from May 21, 1960, to July 27, 1961, plus the reasonable value of vacation pay and other benefits hereinabove referred to, no part of which has been paid.

"WHEREFORE, plaintiff prays judgment against the defendants and each of them in the sum of $11,-900.00, plus such additional sums as on the trial of this action may be established to be due him as and for vacation pay and other benefits, and for such other and further relief, including costs of suit, as to the Court may seem just and proper in the premises."

From the briefs of the parties it should be noted that a question of this Court's jurisdiction lurks in the record, and in this regard Pacific Bechtel Corporation, in its post-trial brief, p. 5, lines 17–24, made the following observations:

"The question of jurisdiction is of course always before the court.

This rule is set forth in 28 U.S.C.A. § 1447(c) as follows:

" '(c) If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the payment of just costs. A certified copy of the order of remand shall be mailed by its clerk to the clerk of the State Court. The State Court may thereupon proceed with such case.' "

The Pre-Trial Order of Judge Oliver J. Carter, filed December 5, 1963, with the Clerk of this Court, among other matters contained the following:

"III. If the plaintiff had completed a full contract, he would have earned $11,900 plus the reasonable value of vacation and other benefits, the agreed upon value of which is $1,392.30. Against this amount there must be set off the monies which plaintiff earned during the period involved, approximately $3,-500."

Paragraph V of the Pre-Trial Order recites:

"V. Plaintiff is claiming $9,792.-30 in damages, being the $11,900 plus $1,392.30, minus the $3,500 referred to in paragraph III above."

It is important to note that the amount to be subtracted is not definitely fixed in the Pre-Trial Order at $3,500 but is merely an approximation of the amount to be set off. However, it appears that the computation of Judge Carter in Paragraphs III and V of his Pre-Trial Order is erroneous. Plaintiff claims that under the contract of employment, Ex. 4 in evidence, the term of the contract was for the period of 18 months and that he was to be compensated at the rate of $850 per month. Therefore, if plaintiff would have completed what he had considered the full term of the contract, 18 months, he would have earned $15,300. Paragraph III of the Pre-Trial Order should have recited that plaintiff would have earned

$15,300 instead of $11,900. Therefore, Paragraph V should have provided:

"Plaintiff is claiming $13,192.30 in damages being the $15,300 plus $1,392.30 minus the $3,500 referred to in Paragraph III above."

Even if Judge Carter's computation were correct, this Court has jurisdiction of this action.

■ This being a diversity action, we must look to the complaint filed in the Superior Court of the State of California to determine whether or not the matter in controversy exceeds the sum of $10,000. The above quoted recitals from the Pre-Trial Order, under the circumstances here, will not make it incumbent upon this Court to remand the case to the Superior Court of the State of California.

In Horton v. Liberty Mutual Insurance Company, 367 U.S. 348, at page 353, 81 S.Ct. 1570, at page 1573, 6 L.Ed. 2d 890, Mr. Justice Black, speaking for the Court, said:

"The general federal rule has long been to decide what the amount in controversy is from the complaint itself, unless it appears or is in some way shown that the amount stated in the complaint is not claimed 'in good faith.' In deciding this question of good faith we have said that it 'must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.' "

No showing has been made here, much less to a legal certainty, of any lack of good faith on the part of plaintiff in alleging in his complaint filed in the Superior Court of the State of California the amount in controversy to be in excess of $10,000.

In St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, beginning on p. 288, 58 S.Ct. 586, p. 590, 82 L.Ed. 845, the following appears from the opinion of Mr. Justice Roberts speaking for the Court:

"The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts. The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.

"What already has been said, and circumstances later to be discussed lead to the conclusion that a dismissal would not have been justified had the suit been brought in the federal court. The principles which govern remand of a removed cause, more urgently require that it should not have been remanded. In a cause instituted in the federal court the plaintiff chooses his forum. He knows or should know whether his claim is within the statutory requirement as to amount. His good faith in choosing the federal forum is open to challenge not only by resort to the face of his complaint, but by the facts disclosed at trial, and if from either source it is clear

that his claim never could have amounted to the sum necessary to give jurisdiction there is no injustice in dismissing the suit. Indeed, this is the court's duty under the Act of 1875. In such original actions it may also well be that plaintiff and defendant have colluded to confer jurisdiction by the method of the one claiming a fictitious amount and the other failing to deny the veracity of the averment of amount in controversy. Upon disclosure of that state of facts the court should dismiss.

"A different situation is presented in the case of a suit instituted in a state court and thence removed. There is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court or that the parties have colluded to that end. For if such were the purpose suit would not have been instituted in the first instance in the state but in the federal court. It is highly unlikly [sic] that the parties would pursue this roundabout and troublesome method to get into the federal court by removal when by the same device the suit could be instituted in that court. Moreover, the status of the case as disclosed by the plaintiff's complaint is controlling in the case of a removal since the defendant must file his petition before the time for answer or forever lose his right to remove. Of course, if, upon the face of the complaint, it is obvious that the suit cannot involve the necessary amount, removal will be futile and remand will follow. But the fact that it appears from the face of the complaint that the defendant has a valid defense, if asserted, to all or a portion of the claim, or the circumstance that the rulings of the district court after removal reduce the amount recoverable below the jurisdictional requirement, will not justify remand. And though, as here, the plaintiff

after removal, by stipulation, by affidavit, or by amendment of his pleadings, reduces the claim below the requisite amount, this does not deprive the district court of jurisdiction.

"Thus events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached."

The application of the rule stated in St. Paul Mercury Indemnity Co. v. Red Cab Co., supra, to the facts here, is well illustrated in Tullos v. Corley, 6 Cir., 337 F.2d 884 (1964), where, on p. 886, the Court of Appeals, citing and following the St. Paul Mercury Indemnity case, stated:

"[1] Thus is presented the question, whether the foregoing evidence establishes to a legal certainty that plaintiff's claim is less than the jurisdictional amount of $10,000.00. Before dismissal may be made for lack of jurisdictional amount, it must appear to a legal certainty that the claim is less than the jurisdictional amount. Mere inability to recover an amount sufficient to give the court jurisdiction does not make the claim a colorable one and oust the jurisdiction of the Federal Court."

As has heretofore been stated, this Court has jurisdiction to hear and determine this action.

### THE COURT WILL NOW CONSIDER THE MERITS.

At the beginning of the trial, Mr. Leonard, of counsel representing the plaintiff, and Mr. Van Hoesen, of counsel representing defendant Pacific Bechtel Corporation, agreed that the Bechtel Corporation had been dismissed and that the only remaining defendant in the case is Pacific Bechtel Corporation. Trans. p. 2.

Pursuant to Judge Carter's "Order Granting Leave to Amend," plaintiff did, on January 29, 1963, cause to be filed

with the Clerk of this Court his First Amended Complaint for damages, and on February 28, 1963, defendant Pacific Bechtel Corporation caused to be filed its Answer to the aforesaid Amended Complaint. Judge Carter's Pre-Trial Order was signed by him and filed with the Clerk of the above entitled Court on December 5, 1963.

The nature of this action and the contentions of the parties are shown and summarized in Judge Oliver J. Carter's Pre-Trial Order. Among other matters, the Pre-Trial Order recites:

"I. In January of 1960 J. L. Barton, plaintiff, entered into a Memorandum of Agreement with Bechtel Corporation at San Francisco, California, a true and correct copy of which is attached hereto and marked 'Exhibit A.'[1] Pursuant to said agreement, plaintiff proceeded to the Far East and on January 27, 1960, in Singapore, entered into a written agreement with Pacific Bechtel Corporation, a true and correct copy of which is attached hereto and marked 'Exhibit B.'[2] Pursuant to said agreement, plaintiff commenced his employment in Indonesia on or about February 3, 1960. Plaintiff's employment was terminated on May 20, 1960, and he returned to the United States.

"II. Plaintiff claims that in terminating his employment defendant breached the contract of employment (Exhibit B)[2] and in any event, that when his employment was terminated, defendant promised to pay to him the remaining balance under the contract.

\* \* \* \* \*

1. Plaintiff's Ex. 1 admitted in evidence is identical with the copy of said Ex. A.

2. Plaintiff's Ex. 4 admitted in evidence is identical with the copy of said Ex. B.

3. Said Ex. C at the trial was marked plaintiff's Ex. 9 for identification but was not offered in evidence by the plaintiff. See Trans. p. 136, lines 14–19; also Trans. p. 138, line 25 to p. 139, line 4 inclusive.

"IV. Defendant Pacific Bechtel Corporation claims that by the terms of said employment agreement it had the right to terminate plaintiff's employment at any time with or without cause therefor. Defendant Pacific Bechtel Corporation denies the existence of any new oral agreement. Additionally, defendant Pacific Bechtel Corporation claims that on or about May 20, 1960, plaintiff executed a general release, a true and correct copy of which is attached hereto as 'Exhibit C.'"[3]

In its brief entitled "Post Trial Brief of Defendant," filed February 1, 1965, Pacific Bechtel Corporation, beginning on p. 8, lines 4–17 of said brief, states:

"The question of the legal significance of the written employment contract in this case is of the utmost importance. The Pre-Trial Order, in paragraph IX(b), lists the termination rights under the contract as one of the prime issues in this case. The written employment contract in question is plaintiff's Exhibit 4 in evidence in this case. The specific language of the contract which is in question is paragraph 2 of the contract, but of course the entire contract is to be considered by this Court.

"The plaintiff would have the court interpret the Employment Contract as giving to the employee a guaranty of employment for a period of eighteen months. The plaintiff contends that under the terms of the written employment contract the employer had no right to terminate the services of the plaintiff."

Ex. C, referred to in the Pre-Trial Order, was subsequently offered in evidence as defendant's Ex. C. See Trans. p. 165, line 16 to p. 168, line 14. The Court held that a ruling on the defendant's offer of Ex. C as an exhibit was postponed pending further foundation. No further foundation was ever attempted to be laid by the defendant and said Ex. C is not in evidence in the case.

This statement concerning the provisions of the Pre-Trial Order, Paragraph IX(b), is not accurate and complete. Paragraph IX(b) of the Pre-Trial Order reads as follows:

"IX. The issues are:

"(a) * * *

"(b) Whether defendant Pacific Bechtel Corporation, under the terms of its written employment agreement with plaintiff, had the right to terminate plaintiff's employment at will."

The statement quoted from defendant's brief, just above, that plaintiff contends that under the terms of the written employment agreement, Ex. 4, Pacific Bechtel had no right to terminate plaintiff's services, is an incorrect statement. Plaintiff does not dispute that defendant would have the right to terminate the contract FOR CAUSE as stated in said contract.

█ Defendant is the author of Ex. 4, the contract of employment. It caused to be prepared the provisions of the contract including, of course, Section 9 thereof stating and defining causes of termination by the defendant. As we have already noted, Paragraph IX(b) on p. 4 of the Pre-Trial Order defines as an issue to be determined in this case the question whether the defendant had the right to terminate plaintiff's employment at will. This issue arises out of the contention of the defendant as shown by Paragraph IV of the Pre-Trial Order in which it is stated:

"Defendant Pacific Bechtel Corporation claims that by the terms of said employment agreement it had the right to terminate plaintiff's employment at any time with or without cause therefor. * * *"

If such were the fact, why the necessity for defining causes for termination of the plaintiff?

## LACK OF MUTUALITY.

"Where one party reserves an absolute right to cancel or terminate the contract at any time mutuality is absent." 17 C.J.S. Contracts § 100, p. 452.

"Broadly speaking, mutuality of obligation is an essential element of every enforceable agreement." 17 C.J.S. Contracts § 100, p. 444.

Further, in regard to Paragraph IX (b), the issue there stated, "whether defendant Pacific Bechtel Corporation * * * had the right to terminate plaintiff's employment at will," would make necessary a determination as to whether plaintiff was employed for a definite period of time. It seems obvious that if, under the contract, defendant had the right to terminate plaintiff's employment at will, Ex. 4 did not provide for any definite term of employment. To aid in deciding the issue raised by Paragraph IX(b) of the Pre-Trial Order, we will examine the provisions of the employment agreement, if any, relating to the subject of whether, under said contract, plaintiff was to be employed for a definite period of time.

Section 2 of the contract is as follows:

"Section 2. TERM OF AGREEMENT

The term of this Employment Agreement shall be the period during which the Contractor desires the services of the Employee in connection with construction or other work in Indonesia and/or other Far East areas; provided, that after eighteen (18) months' continuous employment from date of this Employment Agreement, the Employee may terminate his employment hereunder by giving the Contractor written notice specifying the date on which he desires to terminate his employment which date shall not be less than fifteen (15) days after the date of delivery of notice to the Contractor. The Contractor will, except in the case of termination for cause under Section 8 of this Employment Agreement or termination after a period of eighteen (18) months' continuous employment hereunder, give to the Em-

ployee at least fifteen (15) days written notice of the date on which it desires to terminate his employment or, in lieu of such notice, will on termination pay to the Employee, in addition to the amounts payable hereunder up to the date of termination, fifteen (15) days' pay computed at the monthly rate herein provided without overtime, vacation or bonus allowances."

We should here note that said Section 2 in effect requires the employee, plaintiff here, to serve at least 18 months' continuous employment. The employee's right to terminate his employment does not come into existence until after 18 months' continuous service from the date of the employment agreement, Ex. 4. See the proviso in the first sentence of said Section 2.

Section 8 referred to in Section 2 of the employment agreement sets forth no statement as to what is or is not cause for the termination of plaintiff's employment by the defendant. Section 9, however, of the employment agreement deals with such subject as follows:

"Section 9. TERMINATION OF EMPLOYMENT

If, prior to the completion of eighteen (18) months' service hereunder, the Employee quits or this Employment Agreement is terminated by the Contractor for cause, all salary, travel allowance and other payments and compensation shall cease as of the time of quitting or discharge, and the Employee shall thereafter be liable for and shall pay his own costs of living and his own return transportation costs and expenses, and no further obligation shall exist on the part of the Contractor to the Employee. Termination for cause shall include but not be limited to the following: Lack of ability of the Employee to perform the work of the classification for which he is hired; bad temper; the immoderate use of alcoholic drinks; the use of narcotics; the

contraction or recurrence of venereal disease; carelessness; insubordination; incompetence; failure to travel as scheduled by the Contractor; failure or refusal to work; the setting of a maximum limit on the amount of work to be done by himself or any other employee; ANY misrepresentation made or concealment of a material fact for the purpose of securing this agreement, or in connection with any medical examination relating to it; request by the Local Government or the party for whom the Contractor is operating, that the Employee be dismissed; violation of currency or other controls of the country in which the work is being performed; subversive activity; or any other act of misconduct."

Along with Sections 2 and 9 in the employment agreement, Ex. 4, the following provisions, together with the statements of the witnesses DeMott and Goh made to plaintiff prior to his acceptance and signing the employment agreement, Ex. 4, may well have induced the plaintiff to believe that the contract, Ex. 4, provided for a definite period of employment, namely, 18 months:

"Section 4. TRAVEL PAY

&ast; &ast; &ast; &ast; &ast; &ast;

(b) In the event the Employee shall, DURING THE TERM OF THIS AGREEMENT, &ast; &ast; &ast;." [Emphasis supplied]

"Section 8. RETURN TRANSPORTATION FUND

(a) The Contractor is hereby authorized to withhold as a return transportation fund, $50.00 per month from the Employee's monthly earnings until a reserve of $600.00 shall have been set aside, which fund shall be paid to the Employee *UPON THE COMPLETION OF EIGHTEEN (18) MONTHS' SERVICE HEREUNDER*; provided, further, that if the Employee

quits or is discharged for cause prior to the *COMPLETION OF SAID PERIOD OF SERVICE,* then all monies due the Employee at the time of such quitting or discharge shall be added to and become a part of said return transportation fund." [Emphasis supplied]

It should be observed that Section 8(a) does not only indicate that plaintiff was employed for a definite period of service but also that that period was 18 months.

Section 8(b) provides:

"(b) If the Employee quits or is discharged for cause prior to the *COMPLETION OF SAID PERIOD OF SERVICE,* the Contractor may apply such fund to the payment on behalf of the Employee, of his costs of living, transportation and other expenses incidental to the Employee's return to the United States; and any part of said fund not so used shall be paid over to the Employee. If this Employment Agreement is terminated by the Contractor prior to *THE COMPLETION OF SAID PERIOD OF SERVICE,* for reasons other than those covered by Section 9, the fund shall be paid to the Employee upon such termination." [Emphasis supplied]

"Section 11. DISCLOSURE OF INFORMATION

"The Employee shall not, *DURING TERM OF THIS EMPLOYMENT AGREEMENT* or thereafter, impart any information relative to the business or affairs of the Contractor to anyone except those employees of the Contractor who are entitled to receive such information." [Emphasis supplied]

"Section 15. DISPOSITION OF EMPLOYEE'S REMAINS

"In the event of the death of the Employee while outside the continental limits of the United States *DURING THE TERM OF THIS EMPLOYMENT AGREEMENT,* the Employee authorizes the Contractor to make appropriate disposition, as shall be deemed best by it under the prevailing circumstances, of the body and personal effects of the Employee." [Emphasis supplied]

From the testimony of James L. Barton it appears that during the summer of 1959 he responded to an "advertisement" by Bechtel Corporation, or Pacific Bechtel Corporation, seeking the employment of a person for "commissary supervisor for overseas." Trans. p. 63. At the "Bechtel Offices" he was referred by a "girl at the waiting desk" to Mr. Frank DeMott. He was informed by Mr. DeMott that "they wanted a man to go overseas to Indonesia and to do practically the same work that I was doing in this country, that is, operating eventually a grocery store, a grocery-store operation, that is, receiving merchandise, storing it, displaying it, and overall supervising of the personnel." Trans. p. 64. Mr. DeMott informed him that the compensation for the employment would be $850 per month; that the contract would be for an 18-month period and perhaps longer. See Trans. pp. 65–69 inclusive, and particularly the following: [Trans. p. 65 beginning with line 5]

"Q. And was there any discussion with Mr. DeMott concerning how long you would be overseas?

"A. It was my understanding that I would be there for 18 months, and even maybe longer.

"Q. But a minimum of 18 months?

"A. Yes, sir. That's right.

"THE COURT: Wait a minute. That doesn't answer the question, does it?

"MR. LEONARD: Not quite, Your Honor.

\* \* \* \* \* \*

"Q. You said it was your understanding—My question was, did you discuss this with Mr. DeMott?

"A. Yes, sir.

"Q. And what did Mr. DeMott say in connection with this question?

"MR. VAN HOESEN: Your Honor, I object to the question. It calls for a hearsay statement. This man apparently is a Bechtel Corporation employee according to the testimony of Mr. Barton. Bechtel Corporation is not a party to this action.

"THE COURT: What?

"MR. VAN HOESEN: Bechtel Corporation is not a party to this action.

"THE COURT: Well, he was a man to whom he has referred to. Now, we will go into that a little bit and see who he referred to.

"Who did he see when he answered the ad? He saw Mr. DeMott. And he was referred to Mr. DeMott by somebody.

"MR. LEONARD: That is correct. Somebody—

"MR. VAN HOESEN: The ad, I believe, was placed by Bechtel Corporation, not Pacific Bechtel Corporation.

"THE COURT: Well, we will find out.

"MR. LEONARD: Q. Do you recall, Mr. Barton, by whom the ad was placed?

"A. No, sir, I don't. I just know that there was an ad in the paper. As far as I can remember, Bechtel was associated with the ad. That's how I happened to know where to go.

"Q. And you went to the Bechtel offices in response to the ad?

"A. That's true, yes, sir.

"Q. And were you referred then by somebody in the Bechtel offices to Mr. DeMott?

"A. The girl at the waiting desk referred me to Mr. DeMott.

\* \* \* \* \* \*

"Q. You saw a young lady at the reception desk and told her you were there in response to that ad?

"A. Yes, sir.

"Q. And she told you the person to see was Mr. DeMott?

"A. Yes.

"Q. And you saw Mr. DeMott?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. All right. In connection with that job, did Mr. DeMott say to you how long—

"MR. VAN HOESEN: I object to the question.

"MR. LEONARD: —the job would last?

"THE COURT: Now, what is your objection?

"MR. VAN HOESEN: The objection is, there is no evidence that Mr. DeMott is an employee or representative of Pacific Bechtel in any way.

"THE COURT: He answered an ad which ultimately resulted in his employment by the Pacific Bechtel Company.

"MR. VAN HOESEN: He answered an ad which resulted in an agreement signed between himself and Bechtel Corporation, and that agreement simply provided that he would go over to Indonesia and enter into another agreement with Pacific Bechtel Corporation.

"THE COURT: Then they're pretty closely connected, those corporations, aren't they?

"MR. VAN HOESEN: Well, it has to be. Pacific Bechtel Corporation is not qualified to do business in the United States or in the State of California. It can't make any advertisements, representations, or have offices here.

"THE COURT: If they had an individual corporation and they acted as their agents recruiting people, I think that would be pretty narrow ground to rule that negotiations for contract which resulted in the contract of employment—

"MR. VAN HOESEN: I take it you are overruling my objection?

"THE COURT: Yes, I am.

"MR. LEONARD: Q. You have the question in mind, Mr.—

"A. Would you mind repeating it?

"Q. The question was: What did Mr. DeMott say to you about the term or duration of the agreement of employment?

"A. Mr. DeMott told me that the contract was for an 18-month period and perhaps longer."

It should here be noted that the objection or objections of Mr. Van Hoesen, of counsel for defendant, were not based upon the ground that the question called for an answer tending to alter or contradict or vary or add to or subtract from or modify or supersede a written contract, Mr. Van Hoesen's objection being that there was no evidence in the record that Mr. DeMott was an employee or representative of Pacific Bechtel in any way.

In December of 1959 or during January of 1960, Mr. Barton was informed by someone connected with Bechtel Corporation, or Pacific Bechtel Corporation, to come into "their office." At that time and place he was asked when he would be ready to go to Indonesia [Trans. p. 71], and he had in December or January another discussion with Mr. DeMott concerning proposed employment. Trans. p. 72.

In the second discussion with Mr. DeMott in December of 1959 or January of 1960, he was again informed that the employment would be for an 18-month period of time. Trans. p. 72 beginning at line 7:

"THE COURT: After you called in, you had another discussion with Mr. DeMott?

"THE WITNESS [MR. BARTON]: With Mr. DeMott the second time, also, yes.

"MR. LEONARD: Q. In the second discussion, which would have been in December of '59 or January of 1960, was there a further discussion about how long the employment would last?

"A. Yes. It was my—

"Q. No, not your understanding. Was there some discussion?

"A. Yes. There was discussion.

"Q. What was it? [4]

"A. That it was for an 18-month period of time.

"Q. Now, you stated that in December or January, December '59 or January '60, you were employed otherwise?

"A. Yes.

"Q. You had another job?

"A. That's true.

"Q. What were you doing?

"A. I was managing a market in Santa Clara.

"Q. Did you give up that job in order to go to Indonesia?

"A. Yes, I did.

"Q. In order to go to Indonesia, was it necessary to spend certain sums of money?

"A. To get ready to go to Indonesia it cost me between seven and eight hundred dollars to get my clothes and to get the necessary items that I needed to go to Indonesia.

"Q. Did they give you a list, a clothing list, and a list of items that you needed?

"A. Yes, they did.

"Q. You had to buy those at your own expense?

"A. Yes, I did.

"Q. And you did?

"A. Yes."

While in San Francisco and before he left for Indonesia, Mr. Barton did, on January 22, 1960, sign an agreement with the Bechtel Corporation [Ex. A of

4. No objection was made to the question, "What was it?"

the Pre-Trial Order] which was presented to Mr. Barton by Mr. DeMott and Mr. George Copeland. Trans. p. 76. At the same time and place, Mr. George Copeland signed the same agreement on behalf of Bechtel Corporation.

The intended effect and purpose of said agreement, Ex. A of the Pre-Trial Order, admitted in evidence as plaintiff's Ex. 1, is illustrated by the statement in Paragraph H appearing just above the signature of Mr. Barton on said Ex. 1. Paragraph H states:

"H) I understand that this Memorandum of Agreement is not, nor is it intended to be, a commitment to hire; but, on the contrary, it is intended and is to be considered an offer on my part to qualify and be prepared to accept employment if and when the said Contractor requests my services. * * *"

Ex. 4, admitted in evidence without objection, was executed at Singapore on the 27th day of January, 1960, and bears the signature of James L. Barton as employee, and the signature of E. C. Goh on behalf of Pacific Bechtel Corporation. Mr. Barton testified that after signing the agreement, Ex. 1, he was given instructions as to whom he should report upon his arriving in the Far East and that upon his arrival in Singapore, he was met by a representative of "Caltex", a Mr. Eddie Goh. Trans. p. 83. And that Mr. Goh presented the agreement, Ex. 4, to him for his signature the day following his arrival in Singapore. Trans. p. 84.

At the trial, plaintiff Barton was shown plaintiff's Ex. 4 and testified that Ex. 4 was a true and correct copy of the agreement that he signed in Mr. Goh's office in Singapore and identified his signature thereon and that of Mr. Goh's on the last page of Ex. 4.

On the occasion of signing Ex. 4, plaintiff testified, in response to a question by Mr. Leonard:

"Q. Will you state what was said by you and Mr. Goh concerning the duration of your contract? [Trans. p. 87, line 17]

* * * * * *

"A. Well, Mr. Goh told me I would have to go to Indonesia and I would be in Indonesia for some— for a year. I had a year's visa, which was unusual. He asked me how I happened to have a year's visa. And I told him, 'Well, I don't know.' I got a very fast visa, I know that, to get into the country.

"And he said, 'Well, that's quite unusual.' And he said, 'I hope you have an enjoyable 18 months,' and so on and so forth. Then he said, 'I will see you in a year to get your new entrance visa.'" [Trans. p. 88]

The foregoing was admitted without objection or motion to strike.

Mr. Barton testified that when he arrived at the jobsite at Rumbai, he reported to a Mr. Miller to whom he had been instructed to report by a Mr. Shobe. Trans. p. 94. Mr. Shobe had been employed by Pacific Bechtel Corporation from September, 1956, until April, 1963. Trans. p. 267.

Mr. Barton testified as to discussion with Mr. Miller at the time he reported to him as follows: [Trans. p. 95]

"Q. And did you have a discussion with Mr. Miller concerning your duties and responsibilities?

"A. Yes, I did.

"Q. Generally would you tell us what was said by Mr. Miller and what was said by you in connection with that matter?

"A. It was receiving and handling of merchandise in the warehouses and the checking out of the merchandise from the warehouses to the commissaries which involved Rumbai, Duri and Dumai. We have commissaries in all of those towns. And it involved receiving of the merchandise from the barges that came across the Malacca Straits, up the Seak River and unloaded at Rumbai. And, as I say, it also involved shipping out from this one

central point to the other commissaries plus the over-all pricing of it and the supervision of the personnel.

"Q. When you had this discussion with Mr. Miller about your duties and what you were to do on the job, did you have with him any discussion about the length of time—

"THE COURT: About what?

"MR. LEONARD: Q. Any discussion * * * I am asking, did you have any discussion with Mr. Miller about the term of your contract? Was there any such discussion with him?

"A. No. It was—we had discussed the contract itself. And it was in sort of a roundabout manner. It was understood that I was to be there for the term of the contract, which is 18 months.

"Q. Did you have any discussion with Mr. Miller about your relationship, if any, with Caltex? When did that first come into the picture? I should put it that way.

"A. Well, Mr. Miller introduced himself as a Caltex man, as a representative of Caltex. And I was told at the time when I was with Mr. Shobe in Djakarta that I would be working with Caltex.

"Q. Mr. Shobe in Djakarta told you that you would be working for Caltex?

"A. That's true. To report to Mr. Miller with Caltex and I would be working for Caltex while I was there.

"Q. Then did you enter upon the duties that you have outlined?

"A. Yes, I did." [Trans. p. 97]

■■ It appears from the foregoing testimony of Mr. Barton that on four occasions, three of which were prior to the signing of the contract, Ex. 4, he was informed by responsible representatives, personnel managers or supervisors, that the employment agreement, Ex. 4, provided in substance and in effect that the term of his employment thereunder

was to be 18 months, and the Court so finds. That these representatives, managers, or supervisors had authority to speak for Pacific Bechtel Corporation is borne out by the testimony of Mr. Shobe who testified under direct examination by Mr. Van Hoesen, of counsel for the defendant, as follows: [Trans. p. 267, line 23]

"Q. Prior to 1956 in your employment with Pacific Bechtel Corporation by whom were you employed?

"A. I was employed variously by Bechtel Corporation. International Bechtel Corporation and Bechtel, or a company of Bechtel, SA—

"Q. Are these foreign subsidiaries of Bechtel Corporation?

"A. All except Bechtel Corporation are foreign subsidiaries of Bechtel Corporation. I have been employed since 1941 for the various Bechtel corporations."

Mr. Shobe also testified that Bechtel Corporation owns Pacific Bechtel Corporation 100 percent; and that he was employed by Pacific Bechtel Corporation as manager of local affairs in Indonesia from September, 1956, to April, 1963.

If we adopt defendant's construction of the contract that there was no 18-month term of employment, the references to an 18-month period contained in the contract, together with the statements of responsible representatives of defendant, were deceptive and fraudulent and misled plaintiff to his prejudice, and we would then have a situation where the facts are such that the law would impute fraud.

So, here we have a state of circumstances opposite to that considered by Judge Marsh, in Central Contracting Co. v. Maryland Casualty Co., W.D.Pa., 242 F.Supp. 858 (1965), 863, where he quoted from the Pennsylvania case of Caplan v. Saltzman, 407 Pa. 250, 180 A.2d 240, at p. 242, the following:

" 'Where the written contract covers or purports to cover the entire

agreement of the parties, and there is no averment and proof that anything was omitted therefrom by fraud, accident, or mistake, all prior and contemporaneous negotiations, representations and verbal agreements are superseded by the written agreement, and parol evidence is inadmissible to alter or contradict or vary or add to or subtract from or modify or supersede the written contract * * *.' "

"Only a statement of facts showing fraud need be alleged; it is not necessary to allege fraud in direct terms. Thus it is not necessary to allege fraud when the facts are such that the law will impute it," 32A C.J.S. Evidence § 979 on p. 483. See Bessen Bros. v. Brooks, 176 Pa.Super. 430, 107 A.2d 623, 626.

To omit the oral statements of defendant's agents and representatives as to the term of the contract, Ex. 4, as this Court would have to in effect do, if it sustained defendant's contention as to its right to terminate plaintiff's employment at any time, such omission would be fraudulent and prejudicial to the plaintiff. The verbal negotiations of the parties and the oral representations made by agents of the defendant, as set forth above, were here properly admitted to prevent the fraudulent attempt of the defendant to terminate plaintiff's employment without cause prior to the expiration of the term.

In view of the nature of the contract, especially that it provided for employment in a far-off country, and that Mr. Barton found it necessary to make substantial expenditures in preparation for his trip and for clothing and other requirements in a strange land, it does not appear to the Court that an intelligent person, such as Mr. Barton undoubtedly is, would undertake such a project under a contract which he understood gave the right of the employer to terminate the employment at any time without cause.

Plaintiff Barton also testified [Trans. p. 101], as to performance of duties un-der the employment agreement, Ex. 4, as follows:

"Q. Now, then, you undertook the responsibilities of your job about the 1st of February, is that right?

"A. That's true.

"Q. And did you perform your duties, then, through February, March, April?

"A. Yes.

"Q. At any time during those months or, indeed, up until the 18th of May, 1960, had you received any criticism of your work from any of the persons you have mentioned who were your superiors?

"A. No criticism, no.

"Q. Had you received any statements of commendation about the work you were doing?

"A. Yes, several.

"Q. And from whom?

"A. Well, from Mr. Miller, from Mr. Quigley and also from Mr. Kell. In fact, Mr. Kell wrote me a note and told me to more or less keep up the good work." [Ex. 5 in evidence]

That Mr. Barton was doing "good work" is borne out by the fact that he was not discharged for any of the causes set forth in Section 9 of the employment agreement, Ex. 4.

From defendant's interrogatories to David Quigley, Ex. E in evidence, we are informed as to defendant's version of its purported reasons in its attempt to terminate the employment agreement, Ex. 4.

THE ALLEGED TERMINATION BY DEFENDANT OF THE EMPLOYMENT AGREEMENT, EX. 4:

Defendant begins its discussion of the alleged termination at p. 23, line 23, of its Post Trial Brief where the following is stated:

"The question of what was said at the time of plaintiff's termination of employment is of major importance in this litigation. There is no question that the plaintiff's em-

ployment was terminated as of May 20, 1960, and that the plaintiff thereafter left the Far East and returned to the United States. But there is a substantial question as to what transpired at the time of this termination. In effect, there are two versions of what happened: The version of the plaintiff and the version of David W. Quigley, the other party involved in the conversations at the time of termination."

Defendant then speaks in its brief of the "Pope photographs," the following beginning on p. 24, line 2, of its brief:

"Before turning to these two versions of what happened at the time of plaintiff's termination, the matter of the Pope photographs should first be explained to the Court. Mr. P. L. Shobe testified at the trial as follows:

"Reporter's Transcript
Page 328, line 15 to page 329 line 10.

"'MR. VAN HOESEN: Q. Mr. Shobe, will you please tell us what you know of your own knowledge about the Flyer Pope?

A. Pope, an American citizen, was employed by the so-called rebels in Indonesia during the Civil War of 1957 and '58 when a portion of Indonesia, including the area where Caltex and Bechtel were operating, withdrew from the central government.

THE COURT: That was in 1958?

THE WITNESS: '57 and '58. I do not know exactly when Pope's employment began.

Pope was a flyer and was provided with planes, a plane, by the rebels, the other part of the revolution against the central government of Indonesia. And during an engagement in Indonesia he was shot down by an Indonesian navy boat and subsequently brought to trial in Djakarta and sentenced to death by the courts in Indonesia for his part in the civil war.

Q. And have you ever heard of any photographs that were taken of this shooting down?

A. I have heard talk of them. I have seen none.'"

The defendant then continues on p. 24, line 29, of its brief:

"The plaintiff himself testified in his deposition of March 16, 1962, that he had in fact seen the pictures of the shooting down of the flyer Pope. Deposition of James L. Barton, plaintiff's Exhibit No. 13, page 14 line 20 to 22. Also, in answers to interrogatories, plaintiff's Exhibit 18B, the plaintiff, in referring to the Pope photographs, stated, at page 2, line 4: 'I told him that I had seen such pictures * * *[5] The plaintiff further admitted in his deposition that he had in fact been questioned by a Mr. Ranusubroto of Government Relations concerning his interest in the Pope photographs. Deposition of James L. Barton, plaintiff's Exhibit 13, page 26 lines 6 to 15.

"David W. Quigley was an employee of Caltex's Pacific Oil Company.[6] His particular job at the

---

5. The omitted portion of plaintiff's answer was: "but that the scrapbook I was having prepared was one of my travels in Java and Sumatra."

6. See Paragraph 8 on p. 1 of defendant's Ex. A, a contract executed between Bechtel Corporation and James L. Barton where it is stated:
"8. I understand, that although my employment agreement is with Pacific Bechtel Corporation at the direction of

Pacific Bechtel Corporation jobsite management, I may be assigned to work under the direction and supervision of the client company for part of, or all of, my term of service; * * *."
And also see Post Trial Brief of defendant Pacific Bechtel Corporation, p. 23, lines 9–22, where Caltex Pacific Oil Company was referred to as "not the plaintiff's employer, but rather the client of the plaintiff's employer."

Rumbai jobsite was Assistant Personnel Manager. At the time of the plaintiff's termination, Mr. Quigley has testified to the following events:

"'Mr. Barton was advised by me on May 18th of the first accusation in respect to the photographs, which he first denied, in the sense that he stated his only interest in possessing the photographs, which he had seen at the home of the owner, was as a souvenir of his stay in Indonesia. When confronted with and questioned relative to the accusation that he had attempted to use Mrs. Natadiputra to transport a large sum of money to the wife of the owner of the photographs in Djakarta, and additionally that the funds had been returned to him by another witness, he did not deny the accusation. I then advised Mr. Barton that I would have to bring this matter to the attention of Management and recommend his release in view of the circumstances. Mr. Barton at that point agreed it would be best for all concerned if he left Indonesia. Accordingly, it was not necessary to advise Mr. Barton of the other accusations made against him. At that point I left Mr. Barton in my office and went to Mr. Alfred Makle's office who was Deputy Managing Director of Caltex. I reviewed Barton's case with Mr. Makle and with Mr. E. Kell, Bechtel's representative in Sumatra, by telephone, and both agreed to a release based on mutual agreement in view of the delicate nature of the circumstances in the case. Upon my return to my office I informed Mr. Barton that both the Bechtel and Caltex Managements agreed it would be in the best interest of all concerned if

he left Sumatra and that he was being terminated by mutual agreement.[7]

"'On May 20th I called Mr. Barton to my office and told him I had been advised that he had been making a number of statements in the camp area that he was being sent out of Indonesia without just cause, and making other statements in respect to the classified material. I explained to him that this was foolhardy in the sense that if such talk got back to the Army it could have serious consequences for him. He agreed to discontinue such talk. I also informed him that as the joint managements of Bechtel and Caltex had agreed to a mutual termination that he would be returned to his place of recruitment in the U. S. at Company expense. He was also informed that he was entitled to pay in lieu of notice under the rules of the Bechtel Corporation which were as far as I could recall the same as Caltex, pay through the last day worked, plus one month's salary in lieu of notice. "'The subject of pay for the balance of Mr. Barton's contract was never brought up by either party in the course of these conversations.'"

Defendant quotes extensively from the testimony of David W. Quigley beginning at line 13 of p. 26 to line 12 on p. 28 of its Post Trial Brief, which testimony is by reference made a part of this opinion.

In his Opening Brief plaintiff states briefly his version of the alleged termination, beginning with line 24 of p. 7 to line 11 of p. 8, as follows:

"On May 18, 1960, plaintiff was called to Mr. Quigley's office without any prior complaint ever having

---

7. By mutual agreement of Caltex and Bechtel Managements only. It does not appear to the Court that Barton agreed to the termination. See Barton's deposition, plaintiff's Ex. 13, p. 29, where he testified in effect that his termination was not agreed to by him.

been registered against his work. In addition to Quigley, Miller was also present, at least part of the time. Quigley told plaintiff, 'We are going to have to send you home,' making complaint about a scrapbook that plaintiff was allegedly having made. Plaintiff denied that there was anything wrong with what he was doing and explained that the book was merely designed to be a record of his travels in Indonesia [Trans. p. 111]. Quigley nevertheless insisted that there was something wrong; * * *, 'I want you out Friday morning * * *.' Plaintiff protested that he did not have to leave, but Quigley insisted. Plaintiff finally asked, 'Well, what about my contract?' Quigley replied, 'Don't worry about your contract. We will give you a paid up contract. We will give you your vacation pay. I just want to get you out of here. I don't want any trouble.'[8] In response, plaintiff said either 'I will be glad to take that on those terms' or 'Well, if that is what you will give me, then I will leave.' * * *"

The alleged cause of Mr. Barton's termination, his interest in and connection with the Pope pictures, was not mentioned or defined in the contract as a cause for termination of Mr. Barton's employment, and the Court believes and therefore holds that the alleged Pope incidents and pictures were a subterfuge by the defendant to avoid its contract with plaintiff. If Mr. Barton did in fact show such interest and took steps to obtain such photographs, a spirit of fair dealing would have suggested to defendant, or its agents, that instead of immediate termination, he should have been warned to cease and desist. There is no evidence in this record that there was any "request by the Local Government or the party for whom the Contractor was operating" that Mr. Barton be dismissed and his interest and conduct in relation to the Pope pictures can-

not be considered a cause for termination by the defendant as included in and defined by Section 9 of Ex. 4, the employment agreement. And it is equally apparent that the last phrase of said Section 9 of Ex. 4, "or any other act or misconduct," could be applied by the defendant in relation to Barton's alleged interest in the Pope pictures. No reasonable man in Mr. Barton's position would consider his alleged interest and activities in the Pope pictures an act of misconduct without some advice and expression from the defendant, or its agents, or at least without some remonstrance, or at least some indication of displeasure by the Indonesian Government. If, in fact, he had shown an interest in such pictures and engaged in any efforts to obtain photographs or pictures of the shooting down of the flier Pope, such interest and conduct could not be considered as "an act of misconduct."

 In view of all the recitals in the contract, the statements of responsible representatives of the defendant, and the circumstances shown by the evidence in this case, the Court accepts plaintiff Barton's version of the alleged termination and finds that the defendant did in effect, at the time of the termination, agree and promise to pay to plaintiff all wages due under the remainder of his 18-month contract plus the vacation and travel benefits due thereunder.

 As this Court has heretofore observed, defendant is the author of Ex. 4, the contract of employment. Therefore, if there is any doubt or uncertainty as to the meaning of ambiguous language in this contract, the contract should be construed most strongly and strictly against the defendant.

> "To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly or strictly against the party by whom, or in whose behalf, the

8. Trans. p. 116, lines 12–15.

contract was prepared or the ambiguous language was used, and liberally and most strongly in favor of the party who is not the author, and not responsible for the use, of the language giving rise to the doubt or uncertainty." 17 C.J.S. Contracts § 324, p. 751.

It should be understood, however, that in the mind of the Court, there can be no reasonable doubt or uncertainty that Ex. 4 provided for an 18-month period of employment.

## FINDINGS OF FACT

Now, upon consideration of all the evidence adduced at the trial, the Court, in addition to the findings hereinabove set forth and the agreed facts as shown by the Pre-Trial Order filed December 5, 1963, makes the following findings of fact:

1. That the plaintiff, J. L. Barton, at the time of the institution of this action was and still is a citizen of the State of California; that defendant, Pacific Bechtel Corporation, was at the time of the institution of this action a corporation duly incorporated and existing under and by virtue of the laws of the Republic of Panama; and that the amount in controversy exceeds the sum of $10,000.

2. That in January of 1960, the plaintiff, J. L. Barton, entered into a Memorandum of Agreement with Bechtel Corporation at San Francisco, California, marked and admitted in evidence upon the trial as Ex. 1. Pursuant to said Agreement, plaintiff proceeded to the Far East and on January 27, 1960, in Singapore entered into a written agreement with Pacific Bechtel Corporation, admitted in evidence as Ex. 4 during the course of the trial.

Pursuant to said agreement, plaintiff commenced his employment in Indonesia on or about February 3, 1960. Plaintiff's employment was allegedly terminated on May 20, 1960, and he returned to the United States.

3. That on four occasions, three of which were prior to the signing of the contract, Ex. 4 in evidence, plaintiff Barton was informed by responsible representatives, personnel managers or supervisors that the employment agreement, Ex. 4, provided that the term of his employment thereunder was to be 18 months.

4. That the aforesaid representatives, managers or supervisors were authorized to and had authority to speak for the defendant, Pacific Bechtel Corporation.

5. That after executing the memorandum agreement, Ex. 1 in evidence, plaintiff Barton found it necessary to make and did make substantial expenditures in preparation for his trip and for clothing and other requirements in Indonesia, and that for such purposes he advanced and expended between $700 and $800.

6. That on or about the 1st day of February, 1960, plaintiff entered upon his employment under the provisions of Ex. 4 and continued to perform duties under said contract through February, March, and April of 1960, and to the time of the alleged termination of his contract May 20, 1960. That during said time of his employment under the provisions of Ex. 4, plaintiff had received no criticism of his work and to the contrary, had received from his superiors, Mr. Miller, Mr. Quigley and Mr. Kell statements of commendation concerning work that he performed.

7. That David W. Quigley was, at all times herein pertinent, an employee of Caltex Pacific Oil Company which was a client of Pacific Bechtel Corporation in the performance of the work in which the plaintiff was engaged under the provisions of Ex. 4.

8. That on May 18, 1960, plaintiff was called to the aforesaid David W. Quigley's office without any prior complaint ever having been registered against his work. In addition to said Quigley, a Mr. Miller, one of plaintiff's superiors on the job, was also present.

9. That on said day, May 18, 1960, said Quigley informed the plaintiff that it was necessary to send him home and gave as a reason for the intended termination of plaintiff's employment plain-

tiff's alleged interest in photographs of the shooting down of a flier named Pope, who was employed by rebels in Indonesia during the civil war of 1957 and 1958, Quigley then claiming that this alleged interest in the pictures of the flier Pope was likely to prejudice the interests of defendant in Indonesia and cause unpleasant relations between the defendant and the Indonesian Government.

10. That the alleged cause of plaintiff Barton's purported termination, his interest in and connection with the Pope pictures, was not mentioned nor defined in the contract of employment, Ex. 4, as a cause for termination of plaintiff's employment.

11. The Court finds that by virtue of the contract, Ex. 4, plaintiff was employed for a term of 18 months and that said contract could not be terminated prior to the expiration of said 18 months by defendant, Pacific Bechtel Corporation, without cause, as stated in Section 9 of said Ex. 4.

12. That the alleged cause of the purported termination of plaintiff's contract of employment, namely, his interest in the Pope incident and pictures of the flier Pope being shot down, was not a cause for termination under the provisions of the contract, Ex. 4.

13. That on or about May 18, 1960, or at any other time, did plaintiff and/or defendant mutually agree to extinguish the written contract, Ex. 4 in evidence; and that plaintiff and defendant did not, on or about May 18, 1960, nor at any other time, or at all, enter into an oral contract as a substitute for the contract, Ex. 4.

## CONCLUSIONS OF LAW

In addition to the conclusions of law set forth in the foregoing opinion, the Court decides:

1. That if the plaintiff had completed the full contract, Ex. 4, he would have earned $15,300 plus the reasonable value of vacation and other benefits, the agreed upon value of which is $1,392.30, or the sum of $16,692.30; and he is entitled to recover said sum of $16,-

692.30 less the sum of $3,400 which plaintiff earned and received prior to the alleged termination, leaving a balance due the plaintiff in the sum of $13,292.30.

2. That plaintiff is entitled to have and recover from the defendant judgment against the defendant, Pacific Bechtel Corporation, the sum of $13,292.-30, together with his costs herein incurred.

Counsel for the plaintiff shall submit to the Court a form of Judgment in accordance with the foregoing.